ESTATE OF KIRBY H. RAAB, DECEASED, PROCTOR K. RAAB, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Raab v. Commissioner
Docket No. 7327-83.
United States Tax Court
T.C. Memo 1985-52; 1985 Tax Ct. Memo LEXIS 578; 49 T.C.M. (CCH) 662; T.C.M. (RIA) 85052; February 4, 1985
John R. Schweitzer, for the petitioner. Edward J. Roepsch and Mark J. Miller, for the respondent. COHEN
*2 MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency of $124,485.58 in estate tax and an addition to tax of $31,121.40 under section 6651(a)(1)[1] for late filing of the estate tax return for the estate of Kirby H. Raab. *581 A further addition to tax under section 6651(a)(1) in the amount of $17,445.11 (25 percent of the amount shown on the return) was assessed by respondent at the time the return was filed. In the notice of deficiency and by assessment at the time the return was filed, respondent also determined additions to tax for late payment under section 6651(a)(2). The Court granted respondent's Motion to Dismiss for Lack of Jurisdiction as to this issue by Order dated October 3, 1984. After concessions, the issues remaining for decision are: (1) Whether all or any portion of the value of a parcel of real property known as Dawn Manor is includable in the decedent's gross estate as a transfer within 3 years of death without adequate and full consideration; (2) Whether all or any portion of the value of certain personal property of the decedent is includable in the decedent's gross estate, and, if so, what value should be placed on that personal property; and *664 (3) Whether there was reasonable cause *582 for the late filing of the estate tax return. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of facts, supplemental stipulation of facts, second supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. Kirby H. Raab (decedent) died testate on October 15, 1978, a resident of Milwaukee, Wisconsin. The decedent was survived by his son Proctor K. Raab (petitioner), the duly appointed personal representative of the decedent's estate. Petitioner resided in Wisconsin at the time the petition was filed. The decedent's Federal estate tax return was due on July 15, 1979. It was not filed, however, until January 11, 1980. The return reported tax due of $69,804.45, which was paid at the time of filing. No extension of time to file or to pay the tax was ever sought. (1) Dawn Manor
In his notice of deficiency, respondent determined that the value of a parcel of real estate known as Dawn Monor -- which was not reported on the estate tax return -- was includable in the decedent's gross estate as a transfer within 3 years of the decedent's death without adequate and full consideration in money or money's worth. *583 The parties agree that the value of Dawn Manor was $100,000 on the date of decedent's death. *4 The decedent inherited Dawn Manor upon the death of his mother, Helen Hammond Raab (Mrs. Raab). Dawn Manor, situated on Lake Delton in Sauk County, Wisconsin, was acquired by Mrs. Raab in May 1947 and was a noted point of interest on tours of the lake and surrounding area conducted by the Wisconsin Alumni Research Foundation (WARF). Mrs. Raab died on May 12, 1970. The decedent was the beneficiary of Dawn Manor and the tangible personal property of his mother's estate under the terms of her will and codicil, which were admitted for probate on May 26, 1970, in Sauk County Court, Probate Division, Baraboo, Wisconsin. A Federal estate tax return filed for her estate valued the Dawn Manor real estate at $33,855 and the personal property located therein at $12,135.05. On or about June 1, 1970, the decedent and Proctor K. Raab executed a written form [the writing] entitled Agreement for Purchase and Sale of Real Estate. The writing indicated that the subject property was situated in Sauk County, Wisconsin; it contained no legal description of the property, but referred to "attached *584 Exhibit A." No exhibit was in fact attached. The writing, on which typewritten insertions are indicated by underscoring, provided in part: Price and terms. The purchase price of said real estate shall be the sum of 35,000.00, of which $     has been paid at the execution and delivery hereof, receipt of which is hereby acknowledged, and the balance is to be paid at 2795 So. Superior St., Milwaukee, WI as follows: $22,000.00 is to be paid within 8 years from the date of this agreement.
*5 Buyer agrees to maintain the property and do the repairs for said 8 year term at which time Buyer will receive a credit on the difference or $13,000.00.
Sale. Sale shall be consummated on or about the 31st day of May, 1978, at Milwaukee, Wisconsin.
Conveyance. Conveyance is to be made by Warranty Deed/Land Contract upon payment of Twenty-Two Thousand Dollars, free and clear of all incumbrances except: (a) Municipal and zoning ordinances and recorded easements (b) Rights of tenants in possession (c) Restrictions, if any * * * Representations. No representations either oral or written other than those expressed herein are part of *585 this sale. The writing made no provision for interest. Decedent's wife was not a party to the writing. The writing was completed at the direction of Earl A. Charlton (Charlton), the decedent's attorney and friend for approximately 25 years. It was intended to apply to Dawn Manor. The writing was never recorded. On September 17, 1974, Dawn Manor was distributed to the decedent pursuant to the Final Judgment and the Abridgment of Final Judgment for the Estate of Helen Hammond Raab. Shortly after the decedent acquired Dawn Manor, a dispute arose as to whether the State Historical Society of Wisconsin (Historical Society) had any interest in the property under an agreement entered into on May 14, 1956, between Mrs. Raab and WARF. Pursuant to the agreement Mrs. Raab agreed to convey Dawn Manor, *6 consisting of the dwelling and grounds, to the Historical Society, subject to successive life estates in herself, her husband, Herman Breitenbach, the decedent, and the decedent's wife, Adelaide Raab, and subject to an easement in favor of WARF. [2] In order to make funds available for the maintenance of Dawn Manor, WARF agreed to pay certain royalties to Mrs. Raab, her husband, *586 the decedent and Adelaide Raab, or to the survivor of them. [3] The agreement specifically provided that the right to receive royalties from WARF was not assignable. The decedent received income under this agreement until the time of his death. On September 30, 1974, the *587 Historical Society filed a Complaint against the decedent and Adelaide Raab, seeking, among other things, a determination that the Historical Society was entitled to Dawn Manor, subject to life estates in the decedent and Adelaide Raab, under the 1956 agreement. Charlton *7 represented the decedent in connection with the Historical Society litigation. Although Proctor K. Raab met at least twice with the attorney representing the Historical Society with respect to it's interest in Dawn Manor, neither Charlton nor Proctor disclosed the 1970 writing relating to Dawn Manor. By stipulation dated September 17, 1975, the Historical Society litigation was settled. The decedent and his wife agreed to pay the Historical Society $25,000 in 1975 and an additional $15,000 thereafter and executed a promissory note secured by a mortgage on Dawn Manor in favor of the Historical Society. The Historical Society executed a quit claim deed dated September 25, 1975, transferring all its right, title and interest in Dawn Manor to Kirby and Adelaide Raab, subject to the mortgage on the property. The deed was recorded on October 20, 1975, in the office of the Register of Sauk County, Wisconsin. *588 The decedent and Adelaide Raab stayed at Dawn Manor on a regular basis until Adelaide's death on November 5, 1977. Dawn Manor was reported as an asset of her estate on Schedule E of Form 706 and valued at $62,000 as of her date of death. The decedent was the sole heir of his wife's estate. On November 7, 1977, the decedent executed a quit claim deed transferring all his right, title, and interest in Dawn Manor to Proctor K. Raab and his wife, Frances Raab. The deed was recorded on February 2, 1978, in the Register's Office of Sauk County, Wisconsin. The deed recited consideration of "one dollar *8 ($1.00) and other good and valuable considerations" and indicated a transfer fee of $35. A Wisconsin Real Estate Transfer Return purportedly prepared in connection with the transfer indicated that the transfer fee was computed upon a total value of real estate transferred of $35,000. On August 7, 1978, the Historical Society executed a release of the mortgage on Dawn Manor upon payment of the balance due on the promissory note executed by Kirby and Adelaide Raab. All payments on the promissory note were made by the decedent and Adelaide Raab. [4]
*589 The decedent paid all utilities, taxes, insurance, repairs, and maintenance expenses for Dawn Manor from the time of his mother's death until his own death on October 15, 1978. Although Proctor K. Raab performed a variety of maintenance services on the property before and after the execution of the 1970 writing, he did not pay for any repairs on the property. The decedent also continued to spend time at Dawn Manor and to perform maintenance services on the property from time to time until his death. Even after the decedent's death, funds of the decedent's estate were used to pay expenses relating to Dawn Manor. The decedent and his wife did not file any Federal gift tax return, nor report on any Federal income tax return, the *9 transaction with respect to the purported transfer of Dawn Manor to Proctor K. Raab. The decedent and Adelaide Raab claimed deductions for maintenance expenses and depreciation of maintenance equipment for Dawn Manor on their Federal income tax returns for 1974 through 1977. Deductions for these items were also claimed on the decedent's final Federal income tax return for 1978. Proctor K. Raab did not maintain records of any cash payments *590 made to the decedent for the transfer of Dawn Manor. (2) Personal Property
Respondent determined in his notice of deficiency that $122,500 in furniture, furnishings and other personal property was properly includable in the decedent's gross estate. Petitioner reported only $2,500 in such property on the decedent's Federal estate tax return. At the time of trial in March 1984, no inventory had been filed in the estate probate proceedings. Respondent's determination of value was based on the estimate of respondent's examiner, Patricia J. Bashaw (Bashaw). In arriving at the $122,500 figure, Bashaw took into consideration records of property received by the decedent from the estate of Helen Hammond Raab, decedent's check registers, Bashaw's own tours of Dawn Manor and her discussions with petitioner and with F. E. Gutschenritter, an appraiser who had *10 appraised the Dawn Manor real estate in March 1975 in connection with the Historical Society litigation. As sole heir of his mother's estate, the decedent received various items of personal property, including art collections, art objects and artifacts, as well as antique furniture and furnishings, valued at $12,135.05 *591 on Schedule F of the Federal estate tax return filed for the estate of Helen Hammond Raab in 1972. On February 19, 1983, Colonel Harold R. Pick (Col. Pick) toured Dawn Manor at the request of respondent and appraised certain personal property located therein. The property appraised by Col. Pick comprised $9,991.50 of the property valued at $12,135.05 on Mrs. Raab's Federal estate tax return. The fair market value of the property appraised by Col. Pick was $32,678 as of the date of decedent's death in 1978. The balance of the property received by the decedent from Mrs. Raab's estate was unaccounted for at the time of Col. Pick's appraisal. The decedent also possessed other items of personal property that were not inherited from his mother, nor reported on his Federal estate tax return, including snowmobiles, boats, golfcarts, bunkbeds, and televisions. These items were discovered by Bashaw during her examination of the decedent's check registers. Several of these items were transferred to Proctor K. Raab shortly before and even after the decedent's death, including a boat and several snowmobiles. Although petitioner represented to Bashaw that he had purchased a boat *11 *592 from his father for $800 cash, records of the Wisconsin Department of Natural Resources indicated that the transfer of the boat was by "gift," as were the transfers of the snowmobiles. [5]
The decedent and Adelaide Raab did not file any Federal gift tax return, nor report on any Federal income tax return, any transaction with respect to the transfer of personal property inherited from decedent's mother. (3) Late Filing of the Estate Tax Return
Petitioner was appointed personal representative of the decedent's estate on October 15, 1978. Letters of administration were issued to him on October 27, 1978. Petitioner was acquainted with Charlton and retained him as attorney for the decedent's estate in October 1978. Charlton's firm *593 had also acted as attorney for the estate of the decedent's wife, Adelaide Raab, for which the decedent served as personal representative. After the decedent's death, Proctor handled estate matters for his mother's estate. Charlton agreed to assume responsibility for probating the decedent's estate, including the filing of the required returns. Charlton continued *12 to act as attorney for the decedent's estate through the date of trial. Petitioner knew that a Federal estate tax return would have to be filed for his father's estate, although he did not know when the return was due. He met on one occasion with Robert M. McCormick, who was associated with Charlton and to whom the task of preparing the return had been delegated. Petitioner was told not to worry and that everything would be taken care of. Petitioner became concerned about the progress of the estate proceedings when he did not hear from his attorneys. Petitioner made several telephone inquiries regarding the progress of the estate tax return, but seldom received a response. During petitioner's visits to Charlton's office, he observed that "[t]here was so much chaos down there; you would see somebody, *594 then they would run out of the office, come back in." Despite the chaos in Charlton's office, petitioner did not dismiss the firm as attorneys for the estate or take any steps to be sure that the tax return was timely. The estate tax return was due July 15, 1979. The return was not filed, however, until January 11, 1980, more than 5 months after the due date. No request for an extension to file the return or to pay the tax was ever made. The return was prepared by Michael J. Widmann, who was associated with Charlton. A letter dated January 9, 1980, signed by Widmann, accompanied the return and a check in the amount of $69,804.45 for payment of the *13 tax shown on the return. The reason for the late filing was stated in the letter as follows: We were unable to file said return and pay said tax within nine months from date of death because of our inability to liquidate assets to obtain sufficient cash to pay the tax due. This resulted from a depleted market both for real estate and the stock market that existed from the date of death of Mr. Raab. Widmann had no conversation with petitioner regarding the sale of real estate or stock, and no such sale was necessary *595 as a means of securing the funds to pay the tax. ULTIMATE FINDINGS OF FACT (1) The decedent made a transfer to his son of Dawn Manor within the 3-year period ending prior to his death without an adequate and full consideration in money or money's worth; (2) The value of the decedent's personal property not included on the Federal estate tax return was $50,000 as of the date of death; and (3) There was no reasonable cause for petitioner's failure to timely file the estate tax return. OPINION (1) Dawn Manor
Respondent contends that the value of Dawn Manor is includable in the decedent's gross estate under section 2035. *14 Section 2035, as amended by the Tax Reform Act of 1976 [6] and in effect for the year in issue, requires inclusion in the gross estate of the value of all property transferred by a decedent within 3 years of death, unless the transfer was for an adequate *15 and full consideration in money or money's worth. Under the amended statute the decedent's motives in making the transfer are no longer relevant. [7]
*596 According to respondent, the 1970 writing was unenforceable on its face, was ignored by the parties, and was not effective until the 1977 quit claim deed was recorded on February 2, 1978. Furthermore, respondent maintains that Proctor K. Raab failed to furnish any consideration for the transfer. Petitioner contends that the 1970 writing between the decedent and Proctor governs the transfer, that it took place more than 3 years prior to the date of the decedent's death, and that it was for an adequate and full consideration in money or money's worth. Proctor K. Raab testified that he made cash payments to the decedent, once or twice a month, of $20 to $100. *16 Petitioner claims on brief that Proctor K. Raab made periodic payments to the decedent totaling $8,900 and that he performed maintenance services pursuant to the terms of the agreement. Petitioner reasons, therefore, that if any amount attributable to Dawn Manor is includable in the decedent's estate, that amount should equal the sum of the remaining cash payments due on the purchase price ($13,100), plus the value of 7 months' maintenance ($947.92, computed by dividing the total amount of maintenance credit by *597 the total number of months under the 1970 writing, multiplied by the number of months remaining under the writing: $13,000 / 96 X 7). The subject transaction, of course, was not between strangers, but rather between father and son. It is therefore subject to rigid scrutiny for the purpose of determining whether it is in economic realty what it appears to be on its face. See Estate of Reynolds v. Commissioner,55 T.C. 172, 201 (1970); Mercil v. Commissioner,24 T.C. 1150, 1153 (1955); Fitz Gibbon v. Commissioner,19 T.C. 78, 84 (1952). The decedent's attorney, who drafted the writing, testified at trial that "[i]t was just a friendly transaction, the father and son in our office. It was not any arm's length deal." Even petitioner admitted that the purchase price of $35,000 was "a bargain." Respondent urges us to conclude that the 1970 writing was an unenforceable contract under Wisconsin law. We do not need to determine the enforceability of the writing, however, in order to *17 reach the conclusion that the decedent made *598 a transfer to which section 2035 applies. On the record before us we are not persuaded that the decedent made a completed transfer of his interest in Dawn Manor for purposes of section 2035 prior to the 3-year period ending on the date of his death. We conclude that the decedent did not complete the transfer until he executed and delivered the quit claim deed dated November 7, 1977. The 1970 writing specifically provided that the sale would not be consummated until May 31, 1978, 8 years after execution of the writing. Proctor's testimony confirms the intent to delay the actual transfer. He testified that the substance of the agreement was "that upon his [father's] death, I would be the owner of Dawn Manor. * * * [A]t the end of the contract, I would be the owner." Transfers under such agreements, intended to take effect at death, are generally subject to the Federal estate tax. See section 2036; [8]Commissioner v. Estate of Church,335 U.S. 632 (1949). *599 Moreover, the actions of the parties to the purported agreement were inconsistent with a transfer of ownership in 1970. Legal title to the property was not transferred to the decedent until distribution by the Estate of Helen Hammond Raab on *18 September 17, 1974, 4 years after execution of the writing between the decedent and his son. Thereafter litigation ensued between the Historical Society and the decedent and his wife over the rightful ownership of Dawn Manor under the 1956 agreement to which the decedent's mother was a party. Although the attorney who drafted the 1970 writing also represented the decedent in connection with the Historical Society litigation, the existence of the 1970 writing was not disclosed during the course of the litigation. Petitioner himself met at least twice with the attorney representing the Historical Society, yet never revealed the fact that he had entered into an agreement with his father regarding Dawn Manor. When the litigation was settled, the decedent and his wife agreed to pay the Historical Society a total of $40,000 and executed a mortgage for $15,000 on Dawn Manor. The Historical Society in return executed a quit claim deed *600 transferring all its interest in the property to the decedent and his wife. The final payment under the settlement agreement was not made by the decedent until August 1978, only 2 months before his death. Thus the decedent and his wife (who was not a party to the 1970 writing) paid more to clear title to the property after the 1970 writing than Proctor was to pay under it. Finally, the decedent represented that Dawn Manor was an asset of his wife's estate when she died in 1977. The decedent paid all utilities, taxes, insurance, repairs, and maintenance expenses for Dawn Manor from the time of his *19 mother's death in 1970 until his own death. Proctor never paid for any repairs on the property. The decedent and his wife continued to spend time at Dawn Manor, and the decedent performed some maintenance services himself until his death. Funds of the decedent's estate were used to pay expenses relating to the property after the decedent's death. The decedent's treatment of Dawn Manor for tax purposes is also inconsistent with the purported sale of the property to Proctor. No transaction with respect to the property was ever reported on a Federal income or gift tax return *601 of the decedent. The decedent and his wife claimed deductions for maintenance expenses and depreciation of maintenance equipment for Dawn Manor on their Federal income tax returns for years subsequent to the purported sale to Proctor. Based on the foregoing, we conclude that the decedent did not transfer the property to his son until he executed the quit claim deed in 1977, less than 1 year before his death. Because we have determined that the transfer was within 3 years of the decedent's death, the value of Dawn Manor must be included in the decedent's gross estate under section 2035 unless petitioner can establish that the property was transferred pursuant to a bona fide sale for an adequate and full consideration in money or money's worth. There is a presumption that a transfer between closely related parties is a gift. See Estate of Reynolds v. *20 55 T.C. at 201; Rude v. Commissioner,48 T.C. 165, 172 (1967); Mercil v. Commissioner,24 T.C. at 1153. As we noted in Mercil, the proof offered to overcome *602 such presumption must be "certain, definite, reliable and convincing, and leave no reasonable doubt as to the intention of the parties." Mercil v. Commissioner,24 T.C. at 1153. Petitioner has failed to convince us that he paid any consideration to his father for the transfer of Dawn Manor. Although Proctor and his wife testified that cash payments in small denominations were made to the decedent under the 1970 writing, he stipulated that he could not document any cash payments for the transfer of Dawn Manor. On brief petitioner contends that $8,900 of the $22,000 cash portion of the purchase price was paid and that $13,100 was due. Due to inconsistencies in petitioner's testimony, however, we cannot identify any amount that was clearly paid for the transfer of Dawn Manor. Proctor and his wife also testified that maintenance services were performed by him, which under the 1970 writing would constitute part of the consideration for the transfer of Dawn Manor. The decedent also performed some maintenance services himself and paid for all repairs and maintenance expenses until his death, and estate funds were used to meet these expenses after the decedent's death. *603 If Proctor did perform maintenance services for the transfer of Dawn Manor, *21 those services have not been shown to have a value measurable in monetary terms. On the basis of the entire record we conclude that the decedent made a transfer of Dawn Manor within the 3-year period ending prior to his death without adequate and full consideration and that the full value of the property, stipulated by the parties to be $100,000 as of the date of decedent's death, is includable in the gross estate under section 2035. (2) Personal Property
Petitioner further contends that the personal property located at Dawn Manor is not a part of decedent's estate because it was transferred to Proctor under the 1970 writing relating to the real property. Both petitioner and Charlton testified that the purported agreement was for the conveyance of the Dawn Manor real estate and the personal property located therein. Neither the 1970 writing nor the 1977 quit claim deed, however, made any reference to personal property. Moreover, the 1970 writing contained an integration clause expressly providing that "[n]o representations either oral or written other than those expressed herein are *604 part of this sale." Although petitioner has failed to establish that the purported sales agreement between the decedent and Proctor encompassed the personal property located at Dawn Manor, we need not belabor this point because we have determined that the transfer of Dawn Manor took place within 3 years of the *22 decedent's death without adequate and full consideration. The inclusion of personal property in the purported transfer would only emphasize the inadequacy of the purported consideration. Thus, even if the personal property located at Dawn Manor was to be eventually conveyed pursuant to the 1970 writing, the value of the personal property would be included in the gross estate under section 2035. On the other hand, if the decedent did not make a transfer of the personal property prior to his death, its value must be included as an asset of the estate under section 2033. Thus all of the personal property located at the decedent's residence and Dawn Manor is includable in the gross estate. We must now determine what value should be placed on this property. Respondent's *605 deficiency determination ordinarily carries a presumption of correctness, and the burden of persuasion and the burden of going forward with the evidence rests with petitioner except where otherwise provided in the Internal Revenue Code or the Tax Court Rules of Practice and Procedure. Welch v. Helvering,290 U.S. 111, (1933); Rule 142, Tax Court Rules of Practice and Procedure.
Petitioner alleges that respondent's determination is "arbitrary and without basis in fact". He attacks the method of valuation utilized by respondent's examiner because no specific values were attributed by respondent to any specific assets. Petitioner complains that no matter what proof he may present *23 with respect to the valuation of any specific assets, he has no logical avenue available to disprove the bulk valuations set forth in respondent's statutory notice. Petitioner had an affirmative duty as executor to report any property of the decedent in his possession. Sections 20.6001-1; 20.6018-2, Estate Tax Regs. It was the duty of petitioner, not that of respondent, to marshal *606 the assets of the estate. As of the date of trial, almost 5-1/2 years after the decedent's death, petitioner had not even filed an inventory in the estate probate proceedings. Because petitioner failed to disclose all of the decedent's assets on the Federal estate tax return, respondent was required to first identify those assets and then to arrive at a valuation based on available information. The inventory in the Helen Raab estate provided respondent with ample evidence of missing assets. Petitioner failed to explain adequately the whereabouts and value of the missing assets. Upon reviewing the decedent's check registers, respondent also discovered other assets owned by the decedent, including boats and snowmobiles, among other items, that were not reported by petitioner but were transferred to Proctor K. Raab shortly before and even after the decedent's death. An inference of intentional concealment might well be drawn from this record. Based on the situation faced by respondent, neither respondent's determination nor the method of making it was arbitrary. Petitioner's predicament is of his own *24 making, and he should not be heard to complain. See Estate of Wilson v. Commissioner,2 T.C. 1059, 1086 (1943). *607 We are compelled, however, to apply our "experience with the mainsprings of human conduct to the totality of the facts" in this case. See Commissioner v. Duberstein,363 U.S. 278, 289 (1960). We are persuaded that respondent's determination as to the value of the decedent's personal property was too high. Respondent's examiner testified that the appraisal of col. Pick was "quite a bit lower" than she expected. Respondent's valuation of the Dawn Manor real estate for purposes of the statutory notice was $50,000 higher than the value finally stipulated to by the parties. Respondent's valuations of the estate assets therefore appear to be high. The identified missing and unreported assets were primarily assets inherited by the decedent from his mother's estate, and they have been partially accounted for in the appraisal of Col. Pick. Assets valued at $9,991.50 in 1972 were stipulated by the parties as having a value of $32,678 as of the date of decedent's death in 1978. The balance of the property received by the decedent from his mother's estate, valued in her estate at $2,143.55, was missing from Col. Pick's appraisal. Petitioner testified that of those missing *608 assets, items valued at $1,268 on Mrs. Raab's estate tax return, were still in existence at the time of the appraisal in 1983. The record contains no independent evidence, however, to substantiate petitioner's *25 self-serving testimony as to ownership or the value of assets as of the date of decedent's death. In addition, petitioner admitted that as of the date of death the decedent also owned three snowmobiles, a golfcart, and one or two boats, among other items, but he has not presented satisfactory evidence of the value of those items. With the history of failure to disclose assets and inconsistent statements in this record, we cannot rely solely on petitioner's credibility as to the extent and value of the unaccounted for property. Based on the entire record, we conclude that the value of the decedent's personal property not reported on the estate tax return and includable in the gross estate was $50,000 as of the date of decedent's death. (3) Addition to Tax for Late Filing
Section 6651(a)(1) provides for an addition to tax equal to 5 percent for each month the failure *609 to file a timely return continues, not to exceed 25 percent in the aggregate, unless it is shown that such failure is "due to reasonable cause and not due to willful neglect." The test to be applied in determining whether the failure to timely file was due to reasonable cause is that of "ordinary business care and prudence." See section 301.6651-1(c)(1), Proced. and Admin. Regs. Petitioner contends that he exercised ordinary business care in relying upon experienced counsel to prepare and file the *26 estate tax return and that this reliance constitutes reasonable cause for his failure to file on time. At trial and in his briefs, petitioner relied upon Boyle v. United States,710 F.2d 1251 (7th Cir. 1983). In Boyle, the Seventh Circuit Court of Appeals concluded that reasonable cause had been shown where the executor hired competent counsel soon after his mother's death, cooperated fully and maintained contact with his attorney, and did not "simply abandon the estate once he had delegated the legal functions." 710 F.2d at 1253. The United States Supreme Court, however, has now reversed the decision of the Court of Appeals in Boyle. *610 In announcing a "bright-line" rule in language dispositive of the issue here, the Supreme Court concluded: It requires no special training or effort to ascertain a deadline and make sure that it is met. The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not "reasonable cause" for a late filing under sec. 6651(a)(1). [United States v. Boyle,     U.S.     (Jan. 9, 1985)]
In any event, we do not believe that petitioner exercised ordinary care and prudence in relying on his attorney to file the return in view of petitioner's observance of the chaos in *27 Charlton's office. Thus the addition to tax under section 6651(a)(1) is sustained. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect at the time of the decedent's death (October 15, 1978).↩
2. Mrs. Raab agreed to grant a perpetual easement of passage in favor of WARF over the portion of the grounds of Dawn Manor used in connection with its tours of Lake Delton. Passengers on the tours were transported by "amphibious ducks," which were Army surplus vehicles acquired by Mrs. Raab's husband (Breitenbach) after World War II. ↩
3. The agreement provided that WARF would pay a percentage of the total "duck" fares to Mrs. Raab and Breitenbach, or their survivor, and then to Kirby and Adelaide Raab, or their survivor. The agreement was later amended on May 1, 1959, to also provide for the sale to WARF of Mrs. Raab's interest in a pamphlet entitled "The Dells Story," prepared by Mrs. Raab for sale on the tours. Pursuant to the amended agreement, WARF agreed to pay a royalty to Mrs. Raab, Kirby Raab, and Adelaide Raab, or to the survivor of them, and thereafter to the Historical Society, on all pamphlets sold.↩
4. The decedent and Adelaide Raab made payments to the Historical Society on the secured note as follows: $5,000 on August 15, 1976; $5,000 on August 15, 1977, and $5,000 on August 2, 1978.↩
5. Petitioner also failed to report on the estate tax return other assets having a value in excess of $99,000 as of the date of decedent's death. Among these assets were stocks, cash, and a certificate of deposit, which were transferred by the decedent to his son within 3 years of decedent's death, having a total value of over $45,000. These adjustments were either not contested or were conceded by petitioner, and therefore were not at issue.↩
6. Section 2010(a)(5), Tax Reform Act of 1976, Rub. L. 94-455, 90 Stat. 1520, 1848. Section 2035, applicable to estates of decedents dying after December 31, 1976 (except as to transfers made before January 1, 1977), provided in pertinent part: SEC. 2035. ADJUSTMENTS FOR GIFTS MADE WITHIN 3 YEARS OF DECEDENT'S DEATH. (a) Inclusion of Gifts Made by Decedent.--Except as provided in subsection (b), the value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, during the 3-year period ending on the date of the decedent's death. (b) Exceptions.--Subsection (a) shall not apply-- (1) to any bona fide sale for an adequate and full consideration in money or money's worth * * * Section 2035(d) was subsequently added by section 424 of the Economic Recovery Tax Act of 1981, Pub. L. 91-34, 95 Stat. 172, 317 to partially repeal this provision: (d) Decedents Dying After 1981.-- (1) In general. --Except as otherwise provided in this subsection, subsection (a) shall not apply to the estate of a decedent dying after December 31, 1981. (2) Exceptions for certain transfers. --Paragraph (1) shall not apply to a transfer of an interest in property which is included in the value of the gross estate under section 2036, 2037, 2038, 2041, or 2042 or would have been included under any of such sections if such interest had been retained by the decedent. (3) 3-year rule retained for certain purposes. --Paragraph (1) shall not apply for purposes of-- (A) section 303(b) (relating to distributions in redemption of stock to pay death taxes), (B) section 2032A (relating to special valuation of certain farm, etc., real property), (C) section 6166 (relating to extension of time for payment of estate tax where estate consists largely of interest in closely held business), and (D) subchapter C of chapter 64 (relating to lien for taxes). ↩
7. Prior to amendment under the Tax Reform Act of 1976, section 2035 created a rebuttable presumption that transfers occurring within 3 years of the decedent's death were made in contemplation of death. The crucial question was whether, in light of all the facts and circumstances, the dominant motive in making the transfers was the thought of death or a purpose normally associated with life. United States v. Wells,283 U.S. 102↩ (1931).
8. Respondent contends that the value of Dawn Manor is also includable in the decedent's gross estate under section 2036. Due to our holding that the property is includable under section 2035, it is unnecessary to decide the applicability of section 2036↩.